UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FERRERO U.S.A., INC., and FERRERO CANADA, LTD, | |
| *Plaintiffs*, | No. 22 CV 5890 |
| v. | Judge Lindsay C. Jenkins |
| CHELSEY ERCOLI, | |
| *Defendant*. | |

### MEMORANDUM OPINION AND ORDER

Plaintiffs Ferrero U.S.A., Inc. ("Ferrero USA"), and Ferrero Canada Ltd. ("Ferrero Canada") are North American subsidiaries of a multinational confectionary company. Although each Plaintiff is a discrete legal entity—with a separate corporate existence—they allegedly share a common policy governing the provision of employee relocation benefits. See [Dkt. No. 21-2]. Pursuant to this policy, each Plaintiff extends financial support to new hires and existing employees who need to move cities to take on a new position. [*Id.* at 5[1]]; [Dkt. No. 21, ¶ 2]. This support is not offered gratuitously; employees who accept relocation funding are asked to sign a "Repayment Agreement," under which an employee must pay back some or all of the relocation assistance if she fails to remain in her position for at least "two years following relocation." [Dkt. No. 21, ¶¶ 2, 26]; [Dkt. No. 21-2, 6]; [Dkt. No. 21-3].

---

[1] Citations to exhibits refer to the electronic pagination provided by CM/ECF, not necessarily the page numbers contained in the underlying document.

1

In this diversity action, Plaintiffs seek to enforce one such agreement against Defendant Chelsey Ercoli—an HR professional who twice took advantage of the relocation policy, once while working for each Plaintiff. When Ferrero Canada hired Ercoli in August of 2020, it provided her with $33,435.15 to cover the cost of moving from Chicago to Toronto. [Dkt. No. 21, ¶ 4]. In January of 2022, Ercoli left Ferrero Canada for Ferrero USA, which provided her with an additional $61,733.95 to cover the cost of returning to Chicago. [*Id.* at ¶ 5]. Ercoli resigned from Ferrero USA roughly four months later, and both subsidiaries now seek to recover some or all of these funds. [*Id.* at ¶¶ 6–8].

Before the Court is Defendant's motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim. [Dkt. No. 24]. For the reasons given below, the Court agrees with Defendant that it lacks jurisdiction over this case. Therefore, the Court grants Defendant's motion and dismisses Plaintiffs' first amended complaint without prejudice. Plaintiffs may seek leave to file a second amended complaint no later than April 7, 2023, if they can cure the jurisdictional deficiencies identified by this opinion. Otherwise, the case will be dismissed without prejudice.

I. **Background**[2]

Ferrero Group is a multinational confectionary company with commercial interests that span the globe. [Dkt. No. 21, ¶ 9]. Ferrero Group's North American operations "focus on the manufacture and supply of Ferrero products throughout the

---

[2] The Court accepts the truth of Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in their favor. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

2

United States, Canada, and Puerto Rico." [*Id.*] Like any other multinational corporation, Ferrero Group operates on the global stage through a network of subsidiaries. Plaintiffs in this case are two such subsidiaries—Ferrero Canada and Ferrero USA—each of which employed Defendant at one time or another as an HR professional.

Defendant began working for a Ferrero Group subsidiary—which one is unclear[3]—on December 30, 2019, as a Human Resources Manager. [*Id.* at ¶¶ 19–20]. After less than a year in that role, "Ferrero Canada offered [to hire] Defendant" as an "HR Business Partner," a promotion that would require her to move from Chicago, Illinois, to Toronto, Canada. [*Id.* at ¶¶ 4, 21]. Defendant accepted the offer, the terms of which were memorialized in a "letter of agreement" she signed on August 15, 2020. [*Id.* at ¶¶ 22–23]; *see* [Dkt. No. 21-1].

In addition to the letter of agreement, "Ferrero"—by which Plaintiffs presumably mean Ferrero Canada[4]—"provided Defendant with a copy of its 'Ferrero

---

[3] The Complaint states that "Defendant began working for Ferrero North America." [*Id.* at ¶ 19]. But as Plaintiffs admit in their response brief, Ferrero North America is simply a "region within Ferrero Group's confectionary business, comprised of USA, Canada, and Puerto Rico"—not "a standalone legal entity." [Dkt. No. 29, 15].

[4] Throughout the first amended complaint, Plaintiffs refer collectively to Ferrero Canada and Ferrero USA as "Ferrero"—as though their separate corporate existence can simply be disregarded. See, *e.g.*, [*id.* at ¶ 51] ("Ferrero and Defendant entered into a valid enforceable contract supported by valid and adequate consideration."); [*id.* at ¶ 56] ("Ferrero . . . demands judgment against Defendant for $78,451.53 . . . ."); [*id.* at ¶ 78] ("To the extent that Defendant's Repayment Agreement does not cover all relocation expenses that Ferrero provided Defendant, Ferrero brings a claim for Unjust Enrichment."). "Ferrero," of course, is not a party to this case—Ferrero Canada and Ferrero USA are—and Plaintiffs' failure to consistently differentiate between the two makes it difficult at times to pinpoint which Plaintiff is responsible for taking certain actions.

3

Domestic Relocation Policy Standard' . . . ." [Dkt. No. 21, ¶ 25]; *see* [Dkt. No. 21-2]. According to Plaintiffs, this policy "applied to all Ferrero North America employees seeking relocation assistance, including those employed by Ferrero Canada and Ferrero USA." [Dkt. No. 21, ¶ 25].

Under the policy, "newly hired or current employees who are hired or transferred at the request of" either subsidiary are eligible for relocation assistance. [Dkt. No. 21-2, 6]. Employees receiving such benefits are expected to remain employed for a minimum of two years. In the event that an employee "voluntarily terminate[s] employment or [is] terminated for cause prior to the expiration" of that period, the policy provides that she "must repay relocation expenses previously reimbursed or paid by the Company," according to the terms of an attached Repayment Agreement. [*Id.* at 6, 19].

On August 5, 2020, ten days before agreeing to Ferrero Canada's employment offer, Defendant acknowledged receipt of the relocation policy and signed the attached repayment agreement. [Dkt. No. 21, ¶ 28]; [Dkt. No. 21-3]. By signing that agreement, Defendant "affirm[ed] that it [was her] intention to remain with Ferrero for twenty-four (24) months after" any move for which she received assistance. [Dkt. No. 21-3, 2]. Although the agreement refers to Ferrero, it is not specific to any particular subsidiary. [*Id.*] She further promised that—should she "terminate [her] employment within" that period—she would "reimburse Ferrero . . . 100% of the full amount of financial assistance provided, if employed for less than (12) months" and

4

"50% of the full amount of financial assistance provided, if employed for (12) months, but less than twenty four (24) months." [*Id.*]

Pursuant to the policy, Defendant sought—and Ferrero Canada provided—"$33,435.15 in relocation assistance in connection with her move" to Toronto, including (1) a $6,060.27 "relocation allowance"; (2) "$6,302.37 for meals, closing costs, gas, lodging, and dual rental assistance"; and (3) "$21,072.50 in management fees for the shipment of Defendant's household goods . . . ." [Dkt. No. 21, ¶ 34]. Defendant began her new role with Ferrero Canada on September 7, 2020. [*Id.* at ¶ 35].

Defendant's experience living in Canada was not what she had hoped. Because of Canada's Covid restrictions, her husband—who worked in the hospitality industry—"was unable to find work . . . ." [*Id.* at ¶ 37]. Defendant also felt that the restrictions were "prevent[ing] her from developing her career . . . ." [*Id.*] For these reasons, when a job opened up with Ferrero USA as a "Marketing HR Business Partner," Defendant jumped at the opportunity. [*Id.* at ¶ 36]. Although the job was based out of New Jersey, Ferrero USA agreed that she could perform the position remotely from Chicago. [*Id.* at ¶ 38].

On September 16, 2021, Ferrero USA sent Defendant a letter memorializing the terms of its job offer, to which Defendant formally agreed on September 19, 2021. [*Id.* at ¶ 39]; [Dkt. No. 21-4]. Unlike Ferrero Canada, Ferrero USA did not provide Defendant with a copy of the relocation policy, and did not request that she sign an additional repayment agreement. According to Plaintiffs, the agreement Defendant

5

signed in 2020 was understood to apply "to any and all, existing and future, relocation assistance that Defendant requested and received"—not only from Ferrero Canada, but from Ferrero USA as well. [Dkt. No. 21, ¶ 28]; [Dkt. No. 29, 10].

Defendant transferred back to Chicago effective January 1, 2022. [Dkt. No. 21, ¶ 42]. Ferrero USA financed Defendant's return move, including (1) a $12,000.00 "temporary living buyout"; (2) "$16,457.77 for meals, closing costs, gas, lodging, and dual rental assistance"; and (3) $18,561.18 in management fees for the shipment of Defendant's household goods" back to Chicago.[*Id.*]. The amended complaint alleges that these three line items totaled $61,733.95 in relocation assistance.[5] [*Id.*, ¶ 5, 42].

Defendant did not remain in her position with Ferrero USA for long. On April 19, 2022, just over four months after returning to the United States, Defendant resigned. [Dkt. No. 21, ¶ 43]. Because Defendant failed to work for either subsidiary for more than two years after receiving relocation benefits, each sought repayment under the 2020 repayment agreement. Ferrero Canada sought $16,717.58—fifty percent of the $33,435.15 it incurred moving Defendant to Toronto. [*Id.* at ¶ 45]. And Ferrero USA sought $61,733.95 for moving Defendant back to Chicago. [*Id.* at ¶ 46].

Defendant failed to pay, so Ferrero USA commenced this lawsuit. In its initial complaint, Ferrero USA attempted to recover not only the $61,733.95 it provided Defendant, but also the $16,717.58 allegedly owed to Ferrero Canada. [Dkt. No. 1, ¶¶ 40, 51, 63, 70, 76]. Defendant moved to dismiss, arguing, among other things, that

---

[5] As Defendant points out in her motion to dismiss, these items do not, in fact, add up to $61,733.95, [Dkt. No. 24, 15], an issue worth correcting should Plaintiffs seek leave to file a second amended complaint.

6

Ferrero USA lacked third-party standing to seek relief owed to Ferrero Canada. [Dkt. No. 14, 4–6]. In response, Ferrero USA filed an amended complaint joining Ferrero Canada as a party.

That complaint brings four counts—each under Illinois law—for (1) breach of contract; (2) breach of implied contract; (3) promissory estoppel; and (4) unjust enrichment. [Dkt. No. 21]. Defendant promptly moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and, alternatively, under Rule 12(b)(6) for failure to state a claim. [Dkt. No. 24].

Because the Court agrees with Defendant that it lacks jurisdiction, this opinion begins and ends with that issue.

II. **Legal Standard**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's jurisdiction over the subject-matter of the suit. "In all cases, the party asserting federal jurisdiction has the burden of proof to show that jurisdiction is proper." *Travelers Prop. Cas. v. Good*, 689 F.3d 714, 722 (7th Cir. 2012); *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 540 (7th Cir. 2006).

"In evaluating a challenge to subject matter jurisdiction, the court must first determine whether a factual or facial challenge has been raised." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). Whereas "[a] factual challenge contends that 'there is *in fact* no subject matter jurisdiction,' even if the pleadings are formally sufficient," a facial challenge "argues that the plaintiff has not sufficiently '*alleged* a basis of

7

subject matter jurisdiction.'" *Id.* (quoting *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir 2009) (emphasis original)).

Defendant mounts a facial challenge to jurisdiction in this case. She does not dispute the amount each Plaintiff claims it is owed under the August 2020 repayment agreement or, alternatively, under the common law of Illinois. Accepting those allegations as true, she contends that Plaintiffs have nonetheless failed to satisfy diversity jurisdiction's amount-in-controversy requirement. *See* [Dkt. No. 24, 4–6].

"[T]he same standard used to evaluate facial challenges" to the merits of a claim "under Rule 12(b)(6)" applies to the consideration of a facial challenge to subject-matter jurisdiction. *Silha*, 807 F.3d at 174. Accordingly, the Court must—after "accept[ing] all well-pleaded factual allegations as true and draw[ing] all reasonable inferences in [Plaintiffs'] favor"—determine whether those factual allegations "plausibly suggest" the existence of "subject matter jurisdiction." *Id.* at 173–74; *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Where, as here, a facial challenge is premised on a party's failure to satisfy 28 U.S.C. § 1332(a)'s amount-in-controversy requirement, "the proponent's estimate of the claim's value must be accepted unless there is 'legal certainty' that the controversy's value is below the threshold." *Meridian*, 441 F.3d at 541; *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283 (1938).

8

III. **Analysis**

Plaintiffs allege that this case falls within the Court's diversity jurisdiction. Given Ferrero Canada's status as a foreign citizen for jurisdictional purposes, *JPMorgan Chase v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 91 (2002), Plaintiffs presumably mean to rely on 28 U.S.C. § 1332(a)(3). That provision authorizes federal courts to adjudicate civil actions between "citizens of different States and in which citizens or subjects of a foreign state are additional parties."

With one exception not relevant here, a party seeking to proceed under 28 U.S.C. § 1332(a)(3) "must establish both that diversity of citizenship is complete and that 'the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.'" *Good*, 689 F.3d at 717 (quoting 28 U.S.C. § 1332(a)). Plaintiffs bear the burden of alleging sufficient facts to plausibly suggest that each of these jurisdictional pre-requisites is met. For the reasons that follow, Plaintiffs' first amended complaint fails to satisfy § 1332(a)(3)'s requirements.

A. **Amount-in-Controversy**

There is a fundamental impediment to jurisdiction in this case. As Defendant emphasizes in her motion to dismiss, "Plaintiffs are separate and distinct legal entities," and neither seeks more than $75,000 in relief. [Dkt. No. 24, 3–6]. Although the complaint "demands judgment against Defendant for $78,451.53, costs of suit, and any such other and further relief as the Court may deem just and proper," [Dkt. No. 21, at ¶¶ 56, 69, 77, 85], this aggregate sum lumps together amounts Defendant

9

is alleged to separately owe Ferrero Canada ($16,717.58) and Ferrero USA ($61,733.95). [*Id.* ¶¶ 45–46].[6]

Separated out, it is clear that neither Plaintiff independently satisfies the amount-in-controversy requirement. Indeed, in opposing Defendant's motion to dismiss, Plaintiffs do not contend as much. Instead, they seek to aggregate their claims under a narrow exception to "[t]he general rule . . . that the claims of multiple litigants cannot be aggregated to reach the jurisdictional amount in controversy." *Good*, 689 F.3d at 714, 717; *see also Snyder v. Harris*, 394 U.S. 332, 335 (1969).

That exception applies where Plaintiffs share "a 'common and undivided interest' in a single title or right.'" *Good*, 689 F.3d at 718. As the Supreme Court explained in *Troy Bank v. G.A. Whitehead & Co.*,

> When two or more plaintiffs, having separate and distinct demands, unite for convenience and economy in a single suit, it is essential that the demand of each be of the requisite jurisdictional amount; but when several plaintiffs unite to enforce a single title or right, in which they have a common and undivided interest, it is enough if their interests collectively equal the jurisdictional amount.

222 U.S. 39, 40–41 (1911).

In *Travelers Property Casualty v. Good*, the Seventh Circuit embraced a two-prong test—first articulated in *Eagle Star Ins. Co. v. Maltes*, 313 F.2d 778 (5th Cir. 1963)—for determining when "the claims of co-parties are 'common and undivided' .

---

[6] The first amended complaint attempts to elide this reality by alleging that both obligations are owed to "Ferrero." [*Id.* at ¶¶ 45–48]. But again, Ferrero is neither a legal entity nor a party to this case. Indeed, Ferrero Canada was joined as a party in light of Defendant's argument that Ferrero USA did not have third-party standing to pursue relief owed to Ferrero Canada. For obvious reasons, Plaintiffs' attempt to avoid the consequences of each other's separate corporate identities must be rejected.

10

. . and thus can be aggregated." 689 F.3d at 721–22. Under that test, claims are common and undivided, "only where each claim (1) is part of a 'common fund' and (2) could not be adjudicated on an individual basis without affecting the interests of the other claimants." *Id.* Although Plaintiffs acknowledge they cannot individually satisfy the amount-in-controversy requirement, they argue that their claims against Defendant satisfy this test.

With respect to the common fund requirement, Plaintiffs understandably place great weight on *Good*'s holding that "a common fund exists when 'plaintiffs share[] a preexisting (pre-litigation) interest in the subject of the litigation.'" *Id.* at 722 (quoting *Gilman v. BHC Secs., Inc.*, 104 F.3d 1418, 1427 (1997)). In Plaintiffs' view, they have such an interest in "the administration and enforcement of" both their joint relocation policy in general and Defendant's repayment agreement more specifically. [Dkt. No. 29, 7]. As for the second requirement, Plaintiffs argue that their interests are co-dependent because "if the Court were to find that the Relocation Policy was not enforceable, neither Plaintiff could rely on it as a basis to enforce Defendant's repayment obligations." [*Id.*]

Both of these arguments fall short. *Good* does not stand for the proposition that *any* preexisting "interest in the subject of the litigation"—no matter how ancillary to the claims asserted or relief sought—creates a common fund. Although it might be semantically possible to read *Good*'s common fund test that broadly, read in context, it is clear that it was never intended to stretch so far.

11

*Good* borrowed the "preexisting (pre-litigation) interest in the subject of the litigation" test from the Second Circuit's opinion in *Gilman v. BHC Secs., Inc.*, 104 F.3d 1418 (1997). In that case, the Defendant stockbroker was sued by a client for whom the Defendant executed securities transactions. 104 F.3d at 1419–20. The putative class plaintiff alleged that the stockbroker had accepted payments for channeling orders to specific market makers—those who match buyers and sellers of securities on securities exchanges—and that these payments breached both the stockbroker's contracts with and fiduciary duties to its clients. *Id.* at 1420. Because each putative class member's "'individual stake' . . . total[ed] only 'one [or] two cents per share' of stock traded" through the stockbroker, diversity jurisdiction would lie only if the class members could aggregate their claims. *Id.* at 1421–22.

The putative class plaintiff argued that aggregation was appropriate because the relief sought—disgorgement of the unlawful payments—would "produce a common fund in which all class members would have a common and undivided interest." *Id.* at 1427. The Second Circuit rejected this argument, emphasizing that "a 'fund' is created to facilitate the litigation process in virtually every class action, and has nothing necessarily to do with whether the plaintiffs shared a pre-existing (pre-litigation) interest in the subject of the litigation." *Id.* By "pre-existing . . . interest," the Second Circuit did not mean that *any* common interest "in the subject of" a lawsuit would permit aggregation—"what controls is the nature of the right asserted" and whether the parties share a pre-litigation interest in that right. *Id.* Because the putative class in *Gilman* did not possess "a *unitary claim*," the Second

12

Circuit held that the common fund requirement was not satisfied. *Id.* at 1428 (emphasis added).

*Good* adopted *Gilman*'s common fund test in a similar context. In that case, two affiliated insurance companies sought a declaratory judgment that insurance policies each had issued to a shoe company did not cover claims brought against that company in a state class action. 689 F.3d at 716–17. In settling the class action, the shoe company assigned its interest in those policies to the class. *Id.* at 716. As in *Gilman*, no class member (who, because of the case's declaratory posture, were defendants) had a claim worth more than $75,000 against either insurer. *Id.* at 717. On appeal, the Seventh Circuit held that diversity jurisdiction was lacking. It considered the possibility that the insurers could aggregate the value of their claims against the defendant class members, but found that the class members "did not share a pre-existing interest in recovery against" either the shoe company or the insurers. *Id.* at 722. In reaching this conclusion, the Court emphasized that the claims of each defendant class member "arose from separate transactions," were held individually, and entitled each only to damages personally suffered. *Id.*

Understood in this context, it is clear that the common fund requirement is satisfied only where parties possess a joint interest in each other's *claims* and, consequently, the *relief* sought by virtue of those claims. *Gilman*, 104 F.3d at 1428 (emphasizing that although there were similarities between "plaintiffs' claims," those similarities "[did] not demonstrate a *unitary claim*"); *Good*, 689 F.3d at 722 (emphasizing that the defendant class members lacked a "pre-existing interest in

13

*recovery* against" the Plaintiff-insurers); *cf. Griffith v. Sealtite Corp.*, 903 F.2d 495, 498 (7th Cir. 1990) ("[A] court must look to the underlying *causes of action* giving rise to a judgment in order to determine whether the plaintiffs' claims can be aggregated to satisfy the jurisdictional amount.").

Plaintiffs' contrary interpretation relies on an expansive understanding of the pre-litigation "interests" that satisfy the common fund exception. They argue that what matters is not whether parties share a joint interest in the claims asserted and relief sought, but rather whether those claims "derive from a shared or group status that existed prior to the litigation." [Dkt. No. 29, 6].

But this is flatly inconsistent with both *Gilman* and *Good*, and with the bedrock principle that "where . . . claims' are 'cognizable, calculable, and correctable individually,' . . . they are clearly 'separate and distinct' and may not be aggregated to meet the amount in controversy requirement." *Good*, 689 F.3d at 720 (quoting *Gibson v. Chrysler Corp.*, 261 F.3d 927, 945 (9th Cir. 2001)); *Saskatchewan Mut. Ins. Co. v. CE Design, Ltd.*, 865 F.3d 537, 543 (7th Cir. 2017) (holding common fund requirement not met where "[e]ach class member's claim . . . stems from a separate transaction"). It is also in tension with the Supreme Court's holding in *Thomson v. Gaskill*, that "[a]ggregation of plaintiffs' claim[s] cannot be made merely because the claims are derived from a single instrument"—*i.e.*, the relocation policy and repayment agreements here—"or because the plaintiffs have a community of

14

interest"—*i.e.*, Plaintiffs' membership in a common corporate hierarchy. 315 U.S. 442, 447–48 (1942). [7]

In this case, Ferrero Canada and Ferrero USA—distinct legal entities incorporated under the laws of different jurisdictions—do not possess a joint interest in each other's claims. Rather, each Plaintiff seeks to vindicate separate claims arising out of transactions that occurred more than a year apart. Neither party is entitled to the funds allegedly owed to the other. Even though their claims are similar and arise from a single instrument, they are cognizable, calculable, and correctable individually, and, therefore, may not be aggregated.

Even were the Court to find the "common fund" requirement satisfied, Plaintiffs have not shown that their claims satisfy the second requirement for aggregation, namely that the claims "could not be adjudicated on an individual basis without affecting the interests of the other claimants." *Good*, 689 F.3d at 721. Plaintiffs argue that because their rights stem from common policies and instruments, a legal ruling adverse to one party may be adverse to the other. [Dkt. No. 29, at 7]. But this possibility lurks in all cases with multiple plaintiffs. Indeed,

---

[7] Plaintiffs claim to find support for their position in two out-of-circuit decisions, *Hedberg v. State Farm Mut. Auto. Ins. Co.*, 350 F.2d 924 (8th Cir. 1965) and *Eagle v. Am. Tel. & Tel. Co.*, 769 F.2d 541 (9th Cir. 1985). *Eagle* is easily distinguished. In that case, a class of minority shareholders sued a majority shareholder for breach of fiduciary duty. 769 F.2d at 545. The Ninth Circuit held that the class members could aggregate the value of their claims because, under California law, each held a "common and undivided interest . . . in [the] corporation's assets and a right to share in dividends." *Id.* at 546. There is no such joint interest in this case. *Hedberg* is a closer question. The Court in that case permitted aggregation by four affiliated insurance companies with similar rights against a former employee under two employment contracts. 350 F.2d at 927, 931. The Court held that the companies could aggregate their claims because they "possessed a common and joint interest in" the employee's "activities." *Id.* To the extent that Court permitted aggregation by distinct parties with distinct rights, *Hedberg* is inconsistent with the case law of this Circuit.

15

plaintiffs may only join in an action if their claims involve a common question of law or fact. Fed. R. Civ. P. 20(a)(1)(B). And in *Good*, the Seventh Circuit found that the second prong was not satisfied in spite of the fact that an adverse ruling on the scope of the assigned insurance policies could threatened to invalidate the claims of an entire class. *Id.* at 722.

For all of these reasons, the Court holds that Plaintiffs' claims are separate and distinct, and, therefore, may not be aggregated to satisfy 28 U.S.C. § 1332(a)'s amount-in-controversy requirement. Because neither Plaintiff can satisfy that requirement itself, the Court dismisses the complaint without prejudice.

### B. Complete Diversity

The Court adds one closing note on the matter of jurisdiction, in the event Plaintiffs seek leave to file a second amended complaint. "Jurisdictional objections cannot be forfeited or waived." *Good*, 689 F.3d at 718. To establish that the parties in this case are completely diverse, Plaintiffs must prove that neither Ferrero Canada nor Ferrero USA is a citizen of the same state as Defendant. *Altom Transp., Inc. v. Westchester Fire Ins. Co.*, 823 F.3d 416, 420 (7th Cir. 2016) ("[N]o plaintiff may be a citizen of the same state as any defendant."). The first amended complaint provides that Defendant "was a *resident* of Chicago, IL," at three separate points in time: (1) "at the beginning of her employment with Ferrero," (2) "when she resigned on April 19, 2022," and, "upon information and belief," (3) as of the filing of the first amended complaint. [Dkt. No. 21, ¶ 16] (emphasis added).

16

When it comes to individuals, "citizenship means domicile, not residence." *America's Best Inns, Inc. v. Best Inns of Abilene, L.P.*, 980 F.2d 1072, 1074 (7th Cir. 1992). To become a domiciliary of a state, an individual must (1) establish a "physical presence" there with (2) an "intent to remain" for the foreseeable future. *Denlinger v. Brennan*, 87 F.3d 214, 216 (7th Cir. 1996). An individual can have only one domicile at a time, and her residence may not necessarily correspond with her domicile. *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989) (noting that residence and domicile are "not necessarily synonymous . . . and one can reside in one place but be domiciled in another . . . ."); *Heinen v. Northrop Grumman Corp.*, 671 F.3d 669, 670 (7th Cir. 2012).

For this reason, when the parties bearing the burden of establishing diversity jurisdiction "allege residence but not citizenship, the *only* proper step is to dismiss the litigation for want of jurisdiction." *America's Best Inns*, 980 F.2d at 1074 (emphasis added); *Pollution Control Indus. of Am., Inc. v. Van Gundy*, 21 F.3d 152, 155 (7th Cir. 1994) ("[Plaintiff's] complaint failed to establish diversity from the very start, despite its allegations of diverse *residence*, because it did not discuss the parties' citizenship. That alone . . . required a dismissal for lack of subject matter jurisdiction." (emphasis original)). Because Plaintiffs here allege only Defendant's residence and not her domicile, they have failed to establish her citizenship thus failing to establish complete diversity.

17

IV. **Conclusion**

Having concluded that it lacks jurisdiction, the Court grants Defendant's motion to dismiss [Dkt. No. 24]. The amended complaint is dismissed without prejudice. Plaintiffs may seek leave to file a second amended complaint no later than April 7, 2023, if they can do so consistent with this opinion. Otherwise, the Court will dismiss the case without prejudice.

ENTER:     22-cv-5890

Date: March 24, 2023

United States District Court Judge